Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 17 2012, 9:24 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**JENNIFER A. JOAS**
Joas & Stotts
Madison, Indiana

ATTORNEYS FOR APPELLEE:

**CARLA J. GINN**
Indiana Dept of Child Services
North Vernon, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: J.B., Minor Child, | ) ) ) |
| | ) |
| J.J., Mother, and B.B., Father, | ) |
| | ) |
| Appellants-Respondents, | ) |
| | ) |
| vs. | ) No. 40A01-1204-JT-155 |
| | ) |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) |
| | ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE JENNINGS CIRCUIT COURT
The Honorable Jon W. Webster, Judge
Cause No. 40C01-1108-JT-225

**December 17, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

J.J. ("Mother") and B.B. ("Father") appeal the involuntary termination of their parental rights to their child, J.B. Concluding that there is sufficient evidence to support the trial court's judgment, we affirm.

**Facts and Procedural History**

Mother and Father are the biological parents of J.B., born in March 2010. Mother and Father have never been married. The evidence most favorable to the trial court's judgment reveals that J.B. was born testing positive for marijuana. At the time, a guardianship of J.B.'s two older siblings, B.J. and I.G., was already established with Mother's grandparents (collectively referred to as "the great-grandparents") because of Mother's history of substance abuse.

In July 2010, the local Jennings County office of the Indiana Department of Child Services ("JCDCS") received a report that Mother was using illicit drugs, including marijuana and methadone. JCDCS initiated an assessment of the matter and interviewed Mother at the great-grandparents' house where she and Father recently had been living. During the interview with Mother, JCDCS learned that Mother and Father had moved out of the great-grandparents' home and took J.B. with them to live at the maternal grandmother's home approximately one month earlier.[1] JCDCS also learned that Mother and Father had left J.B. with the maternal grandmother, stating that they would return the following day but did not return for approximately two weeks.

---

[1] Mother's explanation as to why she and Father moved residences from the great-grandparents' home to the maternal grandmother's home changed during her interview with JCDCS. Mother initially indicated that she had been "kicked-out" by her grandparents. Appellant's Appendix at 37. Mother later reported that Father had been "kicked out" by the great-grandparents because he had refused to obtain employment. Id.

As part of its assessment, JCDCS asked Mother to sign various releases in order to obtain Mother's medical records. Mother complied, and the St. Vincent Jennings Hospital records released to JCDCS revealed that Mother had tested positive for illegal substances on each of six drug screens administered to her between July 2000 and July 2010. The most recent test results indicated Mother had produced positive results for opiates in May 2010, for methamphetamine in July 2010, and for marijuana and benzodiazepines on a separate screen the same month. JCDCS also discovered that Mother had been diagnosed with bipolar disorder but seemingly was not taking her medication as prescribed.

Meanwhile, JCDCS asked Mother to submit to a drug screen, and Mother complied. Upon learning that Mother's drug screen results were positive for marijuana, JCDCS took J.B. into emergency protective custody. JCDCS then filed a petition alleging J.B. was a child in need of services ("CHINS"). At the time J.B. was taken into protective custody, Father was incarcerated in Dearborn County.

During an initial hearing on the CHINS petition several days later, Mother admitted to the allegations therein and the child was so adjudicated. A dispositional hearing was subsequently held in August 2010. Father remained incarcerated and was not transported for the hearing. Following the hearing, the trial court issued its dispositional order formally removing J.B. from Mother's and Father's custody and making the child a ward of JCDCS. The trial court's dispositional order also incorporated a parental participation plan that directed both parents to successfully complete a variety of tasks and services designed to address their respective parenting deficiencies and substance abuse issues. Specifically, Mother and Father were ordered

3

to, among other things: (1) participate in a drug and alcohol assessment and follow any resulting recommendations; (2) submit to random drug screens; (3) refrain from the use, consumption, manufacture, trade, or sale of any illegal or controlled substances; (4) secure and maintain a stable source of income and suitable housing; and (5) complete a parenting assessment and follow all resulting recommendations.

Both parents' participation in court-ordered reunification services was sporadic from the beginning of the CHINS case and ultimately unsuccessful. Mother continued to struggle with substance abuse throughout the CHINS case, repeatedly testing positive for marijuana and other illegal substances, including heroin. Although she completed a substance abuse evaluation in August 2010, she failed to follow the resulting recommendations to participate in an intensive out-patient treatment program ("IOP"). Mother also refused to complete a mental health assessment and did not participate in individual counseling as recommended.

As for Father, although he was released from incarceration in September 2010, he delayed in submitting to the court-ordered substance abuse assessment until late January 2011. Father then refused to participate in the recommended relapse prevention program, which was recommended based on his past addiction to heroin. Father also tested positive for marijuana on one occasion during the CHINS case in April 2011 and failed to obtain stable housing and employment.

Regarding visitation with J.B., both parents' participation in supervised visits with the child was increasingly inconsistent. Initially, Mother was permitted four visits per week for three hours each. By August 2010, Mother's visitation privileges were reduced to three visits per week for two hours due to non-participation. Father remained

4

incarcerated and was unable to visit with J.B. until September 2010. Between September and December 2010, both parents' visitation privileges continued to be reduced for non-participation, with visits being completely suspended in December 2010. At the parents' request, visitation was reinstated in January 2011. Both parents were allowed one visit per week for one hour. Although the parents' visits with J.B. remained inconsistent, there was a slight improvement in attendance during the early summer of 2011.[2] Both parents were observed to be frustrated and angry during visits with J.B., however, because of their respective inabilities to soothe the child when he cried and/or to understand the child's needs. Soon thereafter, Mother's and Father's participation in scheduled visits with J.B. again began to wane. In July 2011, the parents visited J.B. only one time, having cancelled three scheduled visits and failing to show for a fourth scheduled visit.

In August 2011, JCDCS filed petitions seeking the involuntary termination of Mother's and Father's parental rights. JCDCS also requested that it no longer be responsible for providing supervised visits for the family. JCDCS agreed, however, to allow visits to continue if the parents made arrangements with a service provider.

An evidentiary hearing on the termination petitions was held in January 2012. During the termination hearing, JCDCS presented evidence establishing that although the parents recently had made some minor improvements, including Mother's participation in substance abuse treatment, the overall conditions resulting in J.B.'s removal had remained largely unchanged. The evidence also established that the child was happy and

---

[2] The record reveals that Mother gave birth to another child, Ja.B., in June 2011. The child was immediately adjudicated a CHINS due to Mother's history of involvement with JCDCS, the ongoing CHINS case involving J.B., and Mother's confirmed drug use during her pregnancy with Ja.B. Ja.B. was, however, initially allowed to remain in the home while the family was offered intensive services. Ja.B. was not subject to the underlying proceedings and is not involved in the current appeal.

5

thriving in the care of his pre-adoptive foster family, which was the only family the child had ever really known.

At the conclusion of the termination hearing, the trial court took the matter under advisement. In February 2012, JCDCS filed a motion to reopen evidence in the case. The motion was granted, and additional evidence was presented to the court, including evidence that Mother had recently experienced a relapse and admitted herself into a drug detoxification program. In March 2012, the trial court entered its judgment terminating Mother's and Father's respective parental rights to J.B. Both parents now appeal.

**Discussion and Decision**

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. When, as here, the trial court makes specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied; see also Bester, 839 N.E.2d at 147. Thus, if the evidence and inferences support the trial court's decision, we must affirm. Id.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B.,

6

666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. In re R.H., 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Moreover, a trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)     that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)). "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added). Mother and Father challenge the sufficiency of the evidence supporting the trial court's findings as to subsection (b)(2)(B) and (C) of the termination

statute cited above. Mother and Father also claim they were denied due process of law. We shall address each argument in turn.

## I. Due Process

A parent's interest in the care, custody, and control of his or her children is arguably one of the oldest of our fundamental liberty interests. Bester, 839 N.E.2d at 147. Hence, "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. The Due Process Clause of the United States Constitution likewise "prohibits state action that deprives a person of life, liberty, or property without a fair proceeding." In re B.J., 879 N.E.2d 7, 16 (Ind. Ct. App. 2008), trans. denied. To be sure, the right to raise one's child is an "essential, basic right that is more precious than property rights." In re C.C., 788 N.E.2d 847, 852 (Ind. Ct. App. 2003), trans. denied. Thus, when the State seeks to terminate a parent-child relationship, it must do so in a manner that meets the constitutional requirements of the Due Process Clause. Hite v. Vanderburgh Cnty. Office of Family & Children, 845 N.E.2d 175, 181 (Ind. Ct. App. 2006).

Notwithstanding the significance of the rights involved herein, it is well-established, however, that a party on appeal may waive a constitutional claim. McBride, 798 N.E.2d at 194. In particular, we have previously held that a parent may waive a due process claim in a CHINS or involuntary termination case when it is raised for the first time on appeal. Id. at 194-195; see also In re K.S., 750 N.E.2d 832, 834 n.1 (Ind. Ct. App. 2001) (concluding mother waived claim that trial court violated her due process rights in failing to follow statutory requirements governing permanency hearings, case

8

plans, and dispositional orders because she raised constitutional claim for first time on appeal). This is in keeping with the long-standing general rule that an issue cannot be raised for the first time on appeal. McBride, 798 N.E.2d at 194.

Mother and Father acknowledge in their brief on appeal that there was at least one case plan prepared during the underlying CHINS case which was "attached to a progress report that was filed with the Court on June 22, 2011." Appellant's Brief at 14. Testimony from caseworkers and both parents confirm that there were three child and family team meetings ("CFTM") and one case planning conference during the underlying proceedings and that both Mother and Father attended "all but one" of these meetings. Transcript at 23, 104, 121. Mother and Father nevertheless assert for the first time on appeal that they were denied due process of law because JCDCS "failed to prepare and provide them with case plans for J.B. following the CHINS adjudication." Appellant's Appendix at 13.

A review of the record makes clear that neither Mother nor Father objected to this alleged deficiency at any time during the CHINS proceedings. Additionally, the parents were appointed counsel at the commencement of the termination case, and both parents attended the termination hearing in person and were represented by counsel. Neither parent nor counsel objected to proceeding with the termination hearing, requested a continuance, or argued that the alleged failure to provide the parents with a case plan during the CHINS case constituted a due process violation. Rather, Mother and Father have raised this procedural due process claim for the first time on appeal. We further observe that neither parent argues that his or her due process rights were violated due to irregularities that occurred during the termination proceedings. Based on the foregoing,

9

we conclude that the parents' due process complaint regarding JCDCS's alleged failure to develop a case plan during the CHINS proceeding is waived. See McBride, 798 N.E.2d at 194 (explaining that notwithstanding significance of rights involved in termination proceeding, parent may waive due process claim in CHINS or involuntary termination case when issues are raised for first time on appeal).

## II. Conditions Remedied

Indiana Code § 31-35-2-4(b)(2)(B) requires the State to establish, by clear and convincing evidence, only one of the three requirements of subsection (b)(2)(B). Because we find it to be dispositive, we limit our review to Mother's and Father's allegations of error pertaining to subsection (b)(2)(B)(i) of Indiana's termination statute, namely, whether JCDCS presented clear and convincing evidence establishing that there is a reasonable probability the conditions leading to the removal and continued placement of J.B. outside the parents' care will not be remedied.

The parents argue that they "partially complied with the dispositional recommendations." Appellant's Brief at 11. They further assert that Father had only one dirty drug screen, the parents visited with J.B. "sixty-one percent of the time," and Mother entered a detoxification program following her two most recent positive drug screens. Id. The parents therefore assert that the State failed to prove there is a "reasonable probability that the parents' behavior will not change" and thus they are entitled to reversal. Id. at 18.

In terminating Mother's and Father's parental rights to J.B., the trial court made several detailed findings regarding both parents' history of deficient parenting, Mother's ongoing addiction issues, both parents' chronic housing and income instability, and both

parents' failure to complete and/or benefit from a majority of the court-ordered reunification services. For example, the court found that neither Mother nor Father "has held a job for more than three (3) weeks since July 2010" and that both parents had moved to Dearborn County in November 2011 "due to losing their HUD housing because of [Father's] felony conviction." Appellant's Appendix at 40. The court went on to find that "neither parent had a source of income and were 100% financially supported by [Father's] mother and grandmother" as of the first day of testimony in this matter. Id. at 42.

The trial court acknowledged in its findings that both Mother and Father eventually completed a substance abuse treatment program and that Mother had shown "great progress in her mental health problems" at one point during the CHINS case. The court later observed, however, that at the time of the January 2012 termination hearing "neither parent was participating in substance abuse treatment or mental health counseling in Dearborn County, despite referrals for services there." Id. The trial court further noted that in February 2012 Mother tested positive for heroin, Dilaudid, and morphine on two separate occasions and had voluntarily admitted herself to a detoxification program by the time of the additional evidentiary hearing held on February 17, 2012.

Although Father's recent drug screen results were negative, the trial court noted in its findings that Father had admitted he had also used heroin. The court went on to find, "[JCDCS] has made referrals for services for [both] parents. The parents have either failed to comply with or benefit[] from such services. [JCDCS] has made reasonable efforts in the underlying CHINS cause to reunify the family." Id. at 42-43. The court

11

thereafter concluded that there is a reasonable probability the conditions that resulted in J.B.'s removal and continued placement outside the family home will not be remedied. A thorough review of the record leaves us convinced that clear and convincing evidence supports the juvenile court's findings and conclusions detailed above.

During the termination hearing, JCDCS case manager Deborah Satterfield confirmed that both Mother and Father had failed to successfully complete a majority of the court-ordered dispositional goals including maintaining sobriety, successfully completing individual counseling, and obtaining employment and housing stability, despite a wealth of services available to them for more than one-and-a-half years. In recommending termination of parental rights, Satterfield testified that Mother "continues to struggle" with maintaining her sobriety, explaining that Mother began using illegal substances at age fourteen and had developed a "pattern" of "maintain[ing] a short period of time of sobriety before she relapses." Transcript at 13. Satterfield also testified regarding the parents' inconsistent visitation with J.B. throughout the underlying proceedings, stating that the lack of consistent visitation remained "very much a concern" and continued to be "at the heart of the problem" with regard to reunification. Id. at 15.

Psychologist Julie Griffin also testified during the termination hearing. Dr. Griffin informed the trial court that she was treating Mother for bipolar disorder. Dr. Griffin further reported that once she "got [Mother] on the right medication" Mother began attending weekly appointments and was "doing very well." Id. at 40. Mother later "kind of disappeared for a month" but then "came back and was consistent until about November 2011." Id. Dr. Griffin acknowledged, however, that at the time of the termination hearing, she had not seen Mother for several months and had "no idea" what

12

Mother's current mental health situation was and/or whether Mother was currently taking her medication. Id. at 42.

Addictions Counselor Vickie Cox confirmed that Mother's and Father's participation in weekly group therapy was "off and on." Id. at 52. Home-based counselor Erica Isaacs likewise testified that although she was assigned to the parents' case from September through November 2011, she "never really got the chance to go in and work with [the parents] because of cancellations or no shows." Id. at 57. Isaacs further testified that both parents "showed no interest" in participating in services, even when she attempted to "set up services again" in November 2011. Id. at 58.

As noted above, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's *habitual patterns of conduct* to determine the probability of future neglect or deprivation of the child. In re D.D., 804 N.E.2d 258, 266 (Ind. Ct. App. 2004), trans. denied. "[S]imply going through the motions of receiving services alone is not sufficient" to show that conditions have been remedied if the services "do not result in the needed change, or only result in temporary change." In re J.S., 906 N.E.2d 226, 234 (Ind. Ct. App. 2009). Moreover, where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." In re A.H., 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). After reviewing the record in its entirety, we conclude that clear and convincing evidence supports the trial court's specific findings and conclusions set forth above. These findings, in turn, provide ample evidence to support the court's ultimate decision to terminate Mother's and Father's respective parental rights to J.B. The parents' arguments

13

to the contrary, emphasizing their self-serving testimony, rather than the evidence cited by the trial court in its termination order, amount to an impermissible invitation to reweigh the evidence. See D.D., 804 N.E.2d at 265. Accordingly, we find no error.

### III. Best Interests

We next consider Mother's and Father's assertions that JCDCS failed to prove termination of their parental rights is in J.B.'s best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence. McBride, 798 N.E.2d at 203. In so doing, the court must subordinate the interests of the parent to those of the child. Id. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Moreover, we have previously held that the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. In re M.M., 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

The trial court made several additional pertinent findings and conclusions relating to J.B.'s best interests in addition to the findings previously cited. Specifically, the court found that J.B. was removed from his parents' care when the child was only four-months-old and had remained in foster care ever since that time. As for visitation, in addition to noting both parents' sporadic participation in visits, the court further acknowledged testimony from various witnesses concerning J.B.'s change in "attitude" during visits with the parents at or around the time the child turned one year old. Appellant's

Appendix at 41. The court went on to find that J.B. was seen "crying at visits more than normal and sometimes pushed his parents away." Id.

Based on these and other findings, the trial court concluded that termination of parental rights was in J.B.'s best interests because Mother and Father had "shown over the course of the related CHINS cause that they continue to be unable to provide safety, nurturing, and permanence for their child due to continued substance abuse, particularly by [Mother], failure to obtain and maintain adequate housing and income or otherwise become self-sufficient, failure to address their mental health needs, and failure to establish a parental bond with the child." Id. at 43. Additionally, the court found that termination of parental rights was in J.B.'s best interests because the child needed "stability, safety, nurturing, and permanence" which the parents had been unable to provide over the course of the CHINS case, and any "nominal and/or short[-]term progress" by the parents after approximately nineteen months of services was "not sufficient to foreclose the involuntary termination of parental rights." Id. These findings and conclusions, too, are supported by the evidence.

During the termination hearing, case manager Satterfield testified that Mother and Father "did not visit [J.B.] often enough to maintain a bond with the child." Transcript at 10. Satterfield further testified that "over the life of the case, [the parents] visited [J.B.] approximately 61% of the time . . . [and] went long periods of time without seeing him." Id. Satterfield then explained that this lack of involvement "put a barrier between their parental bond" with J.B. and further indicated that J.B. "has not bonded to his parents at this time." Id. at 11. As for J.B., Satterfield testified that the child was "doing very well"

15

in his pre-adoptive foster home and was "very bonded and very stable in his environment." Id. at 21.

Visit Supervisor Danielle Knoef informed the trial court that although J.B. recognized his parents, "he wasn't real[ly] bonded to them" and "would get upset" when she arrived to transport him to visits with Mother and Father. Id. at 81. Knoef went on to testify that J.B. spent most of his time during visits "crying or being upset," and that the child would act "standoffish" and "push [the parents] away a lot." Id. at 82. Knoef further testified that during the last visit she supervised, J.B. "screamed almost two-thirds of this [three-hour] visit." Id. at 83.

Court-appointed special advocate ("CASA") Joy Langdon also recommended termination of Mother's and Father's parental rights to J.B. as in the child's best interests. In so doing, CASA Langdon informed the trial court that J.B. cried and sobbed "for a majority" of the last supervised visit she observed between the child and parents. Id. at 134. Langdon further testified that J.B. "deserves to have permanency soon[,] and it's not fair to [J.B.] to wait another six months to a year or two to develop that bond" with Mother and Father. Id. at 135.

Based on the totality of the evidence, including both parents' financial and housing instability, failure to successfully complete a majority of the court-ordered reunification services, lack of bond with J.B., and Mother's unresolved struggle with substance abuse, coupled with the testimony from case manager Satterfield and CASA Langdon recommending termination of the parent-child relationships, we conclude that there is sufficient evidence to support the trial court's determination that termination of Mother's and Father's parental rights is in J.B.'s best interests. See, e.g., In re A.I., 825

16

N.E.2d 798, 811 (Ind. Ct. App. 2005) (testimony of court-appointed advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), trans. denied.

This court will reverse a termination of parental rights '"only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made."' Matter of A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

FRIEDLANDER, J., and PYLE, J., concur.